GULF OIL CORPORATION, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 22499–82.     Filed March 18, 1985.

*J. Waddy Bullion, Emily A. Parker, Sean T. Crimmins,
Buford P. Berry, J.Y. Robb III,* and *Margaret S. Alford,* for the
petitioner.

*Raymond L. Collins* and *William B. Lowrance,* for the
respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in
petitioner's Federal income tax for the taxable year 1974 in
the amount of $80,813,428 and for the taxable year 1975 in the
amount of $166,316,320. Petitioner and respondent, with the
approval of the Court, agreed that only certain issues set forth
in the statutory notice of deficiency, petition, and amended
petition would be litigated at a special trial session commenc-
ing on July 30, 1984, at Dallas, Texas.

One of the issues to be litigated at this session was
designated by the parties as the "North Sea Farmout" issue.
This issue requires the resolution of three questions: (1)
Whether there was an effective assignment in the taxable year
1975 by petitioner to Kupan International Co., by virtue of a
document entitled "Kupan Assignment Agreement" entered
into between petitioner and Kupan International Co., dated
December 30, 1975, and effective at the close of business,
December 31, 1975, of an undivided 50 percent of petitioner's

interest in agreements and letter agreements; (2) whether the assignment constituted a transfer under section 367, I.R.C. 1954, as amended, or, in the alternative, whether the assignment was a farm-out or farm-in;[1] and (3) the value of the items transferred. The resolution of the first question in favor of petitioner, i.e., that there was no assignment in the taxable year 1975, would obviate the need to resolve the remaining two questions, and avoid additional trial on this issue. By joint motion, granted on August 13, 1984, the Court has been asked to decide this preliminary question now, in the interest of judicial economy.

The issues for decision, therefore, are: (1) Was the Assignment Agreement a conditional contract; and (2) if the Assignment Agreement was a conditional contract, were the conditions satisfied, and the transfer, therefore, effective during the taxable year 1975.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference.

Gulf Oil Corp. (hereinafter referred to as petitioner, Gulf, or GOC) is a corporation which was organized under the laws of the Commonwealth of Pennsylvania and which has its principal office at 439 Seventh Avenue, Pittsburgh, Pennsylvania. Gulf and certain of its subsidiary corporations, during the taxable years at issue, constituted an "affiliated group" as that term is defined in section 1504, I.R.C. 1954, as amended. Petitioner, directly and through its foreign subsidiaries and affiliates, is engaged on a world-wide basis in the exploration, development, production, purchase, and transportation of crude oil and natural gas and in the manufacture, transportation, and marketing of petroleum products.

Gulf, as the common parent of an affiliated group of corporations, timely filed consolidated Federal income tax

---

[1]"Farm-out" is generally defined within the petroleum industry as an arrangement in which the owner of a working interest retains some part of the leasehold interest and assigns the remainder to another party who assumes part or all of the burden of development and operation. "Farm-in" is generally defined as an arrangement whereby the lessee "buys in" or acquires an interest in a lease or concession owned by the lessor on which oil or gas has been discovered or is being produced. Petroleum Industry Glossary 67–68 (1982).

returns for its taxable years 1974 and 1975 on behalf of itself, and certain of its subsidiary corporations, with the Office of the Internal Revenue Service at Pittsburgh, Pennsylvania.

An overriding fact affecting all transactions at issue in this case is that the laws of the United Kingdom (U.K.) have required that a license[2] to explore for and produce minerals in the U.K. sector of the North Sea be issued only to U.K. citizens resident in the U.K. or to U.K. corporate bodies.

Gulf decided to take its licenses in the U.K. sector of the North Sea in Gulf Oil (Great Britain) Ltd. (GOGB), which had been incorporated in the U.K. on March 1913. GOGB had been and is engaged in the marketing of crude oil products in the U.K. GOGB was a wholly owned subsidiary of Gulf through the taxable year 1975; thereafter, it was a wholly owned subsidiary of Transocean Gulf Oil Co., a wholly owned subsidiary of Gulf. Beginning on August 8, 1964, and as added to or amended in subsequent years, the U.K. Government awarded exploration and production licenses for the U.K. sector of the North Sea to GOGB.

Gulf Oil Production Co. (GOPCO) was incorporated in Delaware on July 16, 1964, as a wholly owned subsidiary of Gulf to conduct operations in the U.K. sector of the North Sea. By an agreement between GOGB and GOPCO dated September 17, 1964, and various supplemental agreements, GOGB transferred to GOPCO all of its interests in its licenses (including licenses which might thereafter be granted to or acquired by GOGB or in which GOGB might thereafter acquire an undivided ownership interest), except that GOGB retained a 12½-percent overriding royalty interest in each of the licensed areas. Subsequent to this agreement, GOGB remained the title holder of the licenses in question, but all activities with respect to the licensed areas were carried out by, and all costs were borne by, GOPCO.

GOPCO received a letter from L. Williams of the Department of Trade and Industry (the predecessor to the Department of Energy),[3] dated February 16, 1973, which stated:

---

[2] "License" and "licence" are used interchangeably in the documents and stipulated exhibits. The American spelling of "license" is used throughout this opinion unless within a direct quotation.

[3] All references in this opinion to the Department of Energy, Inland Revenue, or Inland Revenue Oil Taxation Office refer to agencies, departments, or divisions of the U.K. Government, and not to any similarly named agency, department, or division of the U.S. Government.

ILLUSTRATIVE AND OTHER AGREEMENTS

As you know, offshore petroleum production licences provide that licensees may not assign or part with any licence rights or engage in sub-licensing without the written authority of the Secretary of State.

The Department places a wide interpretation on these provisions and wishes to have prior information about any proposals which could fall within their scope; for example, illustrative and similar agreements, overriding royalty agreements and various licence financing arrangements.

This letter is to give you notice accordingly. It will be in the interest of licensees to advise and consult the Department before entering into any transactions of this nature.

By a December 31, 1974, agreement between GOPCO and Gulf, GOPCO transferred all of its assets and liabilities to Gulf, including all of its North Sea interests acquired through its agreement with GOGB. After the transfer, Gulf assumed all activities and costs with respect to the North Sea interests. The transfer from GOPCO to Gulf was approved by the U.K. Department of Energy (also referred to hereinafter as DOE). By a letter dated December 5, 1975, from W.C. Gladstone of the Inland Revenue Oil Taxation Office to Donald H. North of Price Waterhouse & Co. (Price Waterhouse), Mr. Gladstone confirmed that the agreement between GOPCO and Gulf was approved and that Gulf would be regarded as a licensee within the meaning of section 12[4] of the Oil Taxation Act 1975.[5] Mr. Gladstone also confirmed that no capital gain implications arose from the transfer effected by the agreement.

Kupan International Co. (Kupan) was incorporated in Liberia in 1949. It had been an international finance company for several of Gulf's affiliates. Kupan was a wholly owned subsidiary of Gulf from its creation through the taxable year 1975; thereafter, it was a wholly owned subsidiary of Transocean Gulf Oil Co., a wholly owned subsidiary of Gulf.

In the fall of 1975, Kupan and Gulf began to work on a joint proposal by which a U.K. branch of Kupan would provide financing for some of Gulf's North Sea operations in exchange for a percentage interest in a portion of the property obtained by Gulf from GOPCO. The proposal evolved into the arrangement evidenced by the assignment agreement at issue in this

---

[4]All section references, unless otherwise indicated, and all references to "Acts" are to the statutes of England.

[5]Oil Taxation Act 1975, ch. 22, sec. 12, at 1007.

case. Once the transaction was outlined, and a timetable established, formal offers and counteroffers were made.

By a letter dated November 12, 1975, Gulf offered Kupan 50 percent of Gulf's interests in five projects in the U.K sector of the North Sea: the Dunlin Unit, the Thistle Unit, the Statfjord Field, the 211/19 East Field, and the Brent Crude Oil Pipeline System. Kupan, in turn, would assume 75 percent of Gulf's development expenditure obligations in connection with the five projects. The proposal was made subject to obtaining any necessary approvals from the U.K. Government and other interested parties. By letter dated November 20, 1975, Kupan made a counterproposal to Gulf which did not include the 211/19 East Field, and under which Kupan would issue 65 percent of Gulf's development expenditure obligations rather than 75 percent as initially proposed by Gulf. Kupan's counterproposal was also made subject to obtaining the necessary approvals from the U.K. Government.

Gulf accepted the counterproposal by letter dated December 2, 1975, and arranged for preparation of the assignment agreement and operating agreement, with the restriction that the final agreement would be subject to Department of Energy and other consents to be listed in the agreements. On December 30, 1975, Gulf and Kupan executed two agreements. One was entitled "Kupan Assignment Agreement" (Assignment Agreement), the other "Operating Agreement."

Relevant clauses of the Assignment Agreement provide as follows:

[Clause 1:]

\*     \*     \*     \*     \*     \*     \*

As of and with effect from the close of business on the thirty first day of December, 1975 (hereinafter called "the effective date") *subject only to any requisite consents and approvals being obtained thereafter,* GULF shall and does hereby assign and transfer to KUPAN and KUPAN shall and does hereby accept the assignment and transfer by GULF of,

\*     \*     \*     \*     \*     \*     \*

[Clause 2(b):]
To the knowledge of GULF no notice of default, withdrawal, or revocation has been received by any of the parties to said agreements. GULF hereby undertakes to perform all obligations on its part to be performed under said

agreements from the date hereof *pending coming into force of this agreement.*

[Clause 3:]

GULF and KUPAN will use their best efforts to secure the *approval of the Department of Energy and any other necessary approvals and consents in connection with the assignment of GULF's interests.* If the approval of the Department of Energy and other necessary approvals and consents to the aforesaid assignment are not obtained by June 30th 1976 or such other date as the parties may mutually agree, this Agreement and the said Operating Agreement shall automatically determine on a date to be agreed between the parties * * *

[Clause 10:]

This agreement shall be governed by and construed in accordance with the laws of England.

[Emphasis added.]

The initial premise was that the transaction, if appropriately structured, should have no U.K. tax consequences, positive or negative. Memoranda, notes, telexes, and letters by employees and attorneys of Gulf and employees of Price Waterhouse evidence, however, a continuing requirement that Inland Revenue approve the transaction to avoid any capital gain taxes under section 38(5) of the Finance Act of 1973,[6] obtain relief from petroleum revenue taxes under the Oil Taxation Act 1975, and avoid any other adverse tax consequences. Meetings and conversations were held with Inland Revenue employees throughout the negotiations, and continued after the execution of the Assignment Agreement. It became apparent that the transaction would require three levels of negotiation with the U.K. Government: (1) Participation agreements between the North Sea oil field licensees and the U.K. Government would have to be resolved; after which (2) the Department of Energy would give its approval to the transaction; after which (3) Inland Revenue would give its clearance as to adverse tax consequences.

Potential problems with Inland Revenue were apparent before the execution of the Assignment Agreement. The tax authorities expressed concern about the administrative burden caused by fragmentation in the oil fields, and potential avoidance of petroleum revenue tax under the Oil Taxation Act 1975. More importantly, the tax authorities also declared that capital gains tax would result from the transaction, as

---

[6] Finance Act 1973, ch. 51, sec. 38, at 1464–1466.

structured, under section 38(5) of the Finance Act 1973. The participation agreements that were to be concluded before the Department of Energy could give its consent were also moving more slowly than expected. By mid-January 1976, Gulf began to develop an alternative arrangement by which Kupan would release its rights under the Assignment Agreement to Silvertown Lubricants Ltd. (also referred to as Gulf (U.K.) Offshore Investments Ltd.), which was to become a U.K. subsidiary of Kupan. These changes and others were intended to increase the probability that the necessary consents and approvals could be obtained. Portions of the documents[7] relevant to this opinion, between October 1975, and March 1976, are:

A. Letter from D.H. North, Price Waterhouse, dated October 24, 1975, to B.R. Edwards of Gulf:

Turning now to the farm-in/farm-out arrangements between GOC and Kupan, when matters have reached the stage of a draft agreement between those two companies then I think it is most desirable for the draft agreement to be submitted to the UK Revenue authorities for confirmation on the following points:

1. That no charge to UK capital gains tax will arise as the result of the disposal by GOC of part of its interests in the North Sea fields to Kupan, or on the change in the income sharing ratio.

2. That both Kupan and GOC will obtain tax relief for the capital expenditure which they will be incurring. In this respect I am assuming that Kupan will not take over any of the expenditure already being incurred by GOC but problems can arise in the event of the share of the income from the fields being different from the proportion in which expenditure on the fields is being incurred and this is a matter which requires clearance from the UK Revenue authorities.

3. That no problems will arise in respect of PRT [petroleum revenue tax under the Oil Taxation Act 1975] and that both GOC and Kupan will in principle be able to claim PRT relief (with uplift where appropriate) for the expenditure which they are incurring.

B. Memorandum from J.C. Wilcox, Law Department of Gulf, dated October 27, 1975, to J.W. O'Toole, Tax Department of Gulf, London:

Regarding consents to and notifications of the proposed assignment:—

1. A simple notification to the Government as was done in the case of the assignment from GOPCO to GOC is all that should be necessary in this case. The GOPCO interest was acquired under the "pass through" agreement of 17th September, 1964 with GOGB and no *written* Government consent was

---

[7]Excerpts from all documents have been reproduced literally, with the exception of material appearing in brackets and the addition of emphasis.

obtained for the acquisition. However, if the proposed assignment should take place subsequent to passage of the Petroleum and Submarine Pipelines Bill, the consent of the Minister would be necessary. [Emphasis added.]

This memorandum further notes that the unitisation letter agreements and other contracts and agreements relating to the North Sea oil fields might require consents to the proposed assignment, although the majority of the agreements and contracts required only that notice be given.

C. Notes by D.H. North of Price Waterhouse about a meeting held at Gulf House in London on October 31, 1975; attending: J.W. O'Toole, L.F. White, and B.R. Edwards of Gulf; D.H. North and K.J. Howes of Price Waterhouse:

they were not expecting any UK tax advantage, although they hoped that there would be no disadvantage either. It is essential that these arrangements be effected by 31 December 1975. The broad outline of the arrangements is that Kupan will in future provide 65% of the capital in return for 50% of the income. The reason for the discrepancy is that GOC has incurred the expenditure to date, from which Kupan will benefit, and therefore the latter should take account of the earlier expenditure. * * *

It was agreed that in view of the urgency the matter should be broached with the Revenue at the meeting already arranged for 4 November * * *

D. Notes by D.H. North of Price Waterhouse about a meeting held at Somerset House on November 4, 1975; attending: W.C. Gladstone, N. Hermsen, and M.F. Bickerton of Inland Revenue; D.H. North and K.J. Howes of Price Waterhouse; L.F. White of Gulf:

The question of the Kupan farm in/farm out was then raised, and the Revenue were asked whether they would regard Kupan as a licensee and whether relief for capital expenditure would be available in the proportions in which the expenditure was incurred. DHN [D.H. North] suggested that this was inter-group farm in/farm out, and suggested Schedule 3, paragraph 5 might cover the situation, so that Kupan would stand in the shoes of GOC. The Revenue wished to give the position further consideration and it was suggested that we should send them the draft agreement when it was at a fairly final stage, and then let them know of any subsequent amendments. *They would not clear the position until the Department of Energy had given approval.* [Emphasis added.]

E. Notes by D.H. North about a meeting held at Melbourne House on December 17, 1975; attending: W.C. Gladstone and N. Hermsen from Inland Revenue Oil Taxation Office; L.F.

White and J.J. Fluken from Gulf; D.H. North and K.J. Howes from Price Waterhouse:

Mr Gladstone raised the question of the proposed Kupan farm in, and stated that the Revenue would have to be satisfied that there were very sound commercial reasons for the proposal. They were not generally happy with this sort of agreement, and were concerned at the extent of fragmentation. * * * The first step is to obtain D of E [Department of Energy] agreement, but no application has yet been put in.

Mr Gladstone stated that the Revenue were not certain that there were no capital gains tax implications. These were proved fields, and this was not an arms length transaction. DHN ' said that he hoped that as no cash was passing the Revenue would accept that there was no capital gain. However the Revenue thought that there could be a problem.

*    *    *    *    *    *    *

The Revenue will look further into the capital gains position and also as to whether this is a kind of agreement which they could approve, and will let us know. A draft agreement is to be supplied.

F. Notes by D.H. North of Price Waterhouse with reference to a telephone conversation on December 18, 1975, with N. Hermsen of Inland Revenue:

I telephoned Mr Hermsen to seek clarification as to why the Revenue authorities thought it likely that there would be charge to capital gains tax on the proposed GOC/Kupan farm-in/farm-out arrangement.

*    *    *    *    *    *    *

In the case in the proposed GOC/Kupan arrangements these related to proven fields and Mr Hermsen said that it was the first instance of a farm-in/farm-out arrangement for a proven field. * * * [T]he Revenue authorities thought the consideration received whether in cash or otherwise would be greater than the expenditure originally incurred so that a capital gains tax liability would arise. * * *

Mr Hermsen said that both he and Mr Gladstone are going to give further consideration to the matter in conjunction with Mr Davies.

G. File memorandum by J.W. O'Toole of Gulf with reference to a telephone conversation on December 22, 1975, with D.H. North of Price Waterhouse:

I pointed out to North that no progress is likely to be made with either the DOE or the Revenue on the Kupan farm-in until the Participation agreement has been reached with the DOE. After that occurs we will utilize the goodwill and the commitments in the Participation agreement to achieve both DOE and Inland Revenue approvals of the Kupan farm-in.

### H. Notes by D.H. North of Price Waterhouse with reference to a telephone conversation on December 31, 1975, with L.F. White of Gulf:

I telephoned Len White concerning the proposed Kupan farm-in/farm-out arrangement with GOC * * *. Len White indicated that they had not yet received, or indeed asked for, DOE consent to the proposed arrangements yet since they were still revising the participation arrangements in various fields. It was hoped that these participation arrangements would be completed today following which they would be going to the DOE on the proposed Kupan farm-in. Len White agreed with me that the Oil Taxation Office had indicated that there was no purpose sending the Kupan agreement to them until DOE consent to the arrangements had been obtained and in these circumstances there is no question of anything being sent off this week.

### I. File memorandum by D.H. North of Price Waterhouse with reference to a telephone conversation of January 14, 1976, with W.C. Gladstone of Inland Revenue:

I then mentioned to Mr Gladstone that Gulf were considering having the transfer to a UK subsidiary of Kupan's, so that Section 38(5) could be applied, and Mr Gladstone is to give further thought as to whether they could accept this situation, perhaps if the income expenditure and rights were all brought into line. He suggested that we might sound out the Department of Energy, as this was really a joint approval.

### J. Aide memoire by B.R. Edwards dated February 4, 1976 (referring to the new proposal by which Kupan would assign its rights in the Assignment Agreement to Kupan's U.K. subsidiary):

The purpose of this aide memoire is to describe the subject farm out and the approvals of it to be requested from the Secretary of State under the Petroleum and Submarine Pipelines Act of 1975 and the Inland Revenue under the Oil Taxation Act 1975.

\*      \*      \*      \*      \*      \*      \*

The farm out is effective only after the necessary government approvals and clearances been granted, i.e.:

(a) Approval by the Secretary of State for Energy under the Petroleum and Submarine Pipelines Act 1975,

(b) Approval by the Board of Inland Revenue and certification by the Secretary of State for Energy under the Oil Taxation Act 1975 and

(c) Clearance that capital gains will not arise; Revenue concurrence to the applicability of Section 38(5) of the Finance Act 1973 is being requested.

## K. Notes by D.H. North of Price Waterhouse about a meeting at Gulf House on February 6, 1976; attendees: J.W. O'Toole, L.F. White, and B.R. Edwards of Gulf; K.J. Howes and D.H. North of Price Waterhouse:

it was thought that the best way of tackling the problem was to treat the 30 December 1975 agreement as being a conditional one, the conditions of which have never been satisfied, so that for UK CGT [capital gains tax] there was no disposal. The new agreement between GOC and Kupan UK would then transfer to the latter the rights which Kupan would have had under this 30 December 1975 agreement, and for UK CGT purposes it is irrelevant whether this is a disposal at 30 December 1975 or in February 1976, as it should be protected by Section 38(5) in either case.

## L. Letter dated February 13, 1976, from D.H. North of Price Waterhouse to N. Hermsen of Inland Revenue Oil Taxation Office:

I refer to our recent telephone conversation * * *. Since these agreements were conditional on obtaining the requisite consents and approvals and these consents and approvals have not been obtained, the agreements have never come into effect and we are now enclosing a copy of a draft agreement to be entered into between Gulf Oil Corporation, Silvertown Lubricants Ltd and Kupan International Company whereby Silvertown assumes the rights and obligations which Kupan would have had under the agreements had they become effective.

## M. Telex dated February 23, 1976, from B.R. Edwards of Gulf to H.C. Vivian of Kupan:

THE ORIGINAL PROPOSAL, AS EMBODIED IN THE DECEMBER 30 ASSIGNMENT AND OPERATING AGREEMENTS, WAS FOR KUPAN TO HAVE A BRANCH OPERATION IN THE U.K. stop THIS WAS MODIFIED EARLY IN JANUARY AS PRELIMINARY CONTACTS WITH THE U.K. INLAND REVENUE INDICATED SOME RESISTANCE TO THE BRANCH CONCEPT AND TO GIVING CAPITAL GAINS CLEARANCE IN THE CASE OF A BRANCH stop IT WAS, THEREFORE, DECIDED TO USE A U.K. INCORPORATED COMPANY AS THE KUPAN VEHICLE stop THIS WOULD HAVE NO ADVERSE U.S. TAX CONSEQUENCES, AS COMPARED WITH A BRANCH OPERATION stop IT WAS THOUGH PREFERABLE THAT THIS COMPANY SHOULD HAVE EXISTED ON DECEMBER 30, 1975, AND BEEN A MEMBER OF THE GULF GROUP stop A DORMANT SUBSIDIARY OF GULF OIL (GREAT BRITAIN) LTD., CALLED SILVERTOWN LUBRICANTS LTD., WAS, THEREFORE, SELECTED TO BE THE KUPAN VEHICLE stop

THE TRANSFER OF SILVERTOWN LUBRICANTS LTD. FROM GULF OIL (GREAT BRITAIN) LTD. TO KUPAN SHOULD BE COMPLETED NEXT WEEK stop * * *

WE ARE GOING AHEAD TO OBTAIN THE REQUIRED CONSENTS FOR THE FARMIN FROM THE U.K. GOVERNMENT stop THE DEPARTMENT OF ENERGY WERE INFORMALLY TOLD OF OUR INTENTIONS ON FEBRUARY 4 AND AN AIDE MEMOIRE PRESENTED TO THEM stop THEIR FORMAL CONSENT WILL BE OBTAINED AFTER

PARTICIPATION TERMS ARE SIGNED stop WE HAVE SENT THE INLAND REVENUE THE ENCLOSED DRAFT AGREEMENT AND AN AIDE MEMOIRE * * * stop WE PLAN TO MEET AND DISCUSS THE MATTER WITH THEM, PROBABLY LATE THIS MONTH OR EARLY MARCH stop THEY HAVE ALREADY INDICATED THAT THEY WILL NOT GIVE THEIR FORMAL APPROVAL AS REQUIRED UNDER THE OIL TAXATION ACT 1975, AND THEIR CAPITAL GAINS CLEARANCES, UNTIL WE HAVE OBTAINED THE APPROVAL OF THE DEPARTMENT OF ENERGY stop

### N. Notes by D.H. North of Price Waterhouse and B.R. Edwards of Gulf about a meeting on February 26, 1976, at Oil Taxation Office; attendees: O.P. Davies and N. Hermsen of Inland Revenue Oil Taxation office; L.F. White and B.R. Edwards of Gulf; D.H. North and K.J. Howes of Price Waterhouse:

Davies agreed that the 30 December 1975 agreement could be ignored as a nullity, as it had never come into effect.

\*    \*    \*    \*    \*    \*    \*

Mr White enquired whether it was accepted that Section 38(5) covered Silvertown and whether it was confirmed that the 30 December [1975] agreement was a nullity. Davies thought it must be a nullity because approval was not given and was not now being sought.

The Revenue accepted that the December 30, 1975 agreement between the GOC and Kupan was a nullity, and that the GOC/Silvertown transfer was covered by S. 38(5)F.A. [Finance Act] 1973. No capital gains therefore arose. The remark was made by them that *if the Revenue approved the GOC/ Silvertown farm out it would be the first occasion on which they had approved fragmentation.* [Emphasis added.]

### O. Implementation schedule dated March 3, 1976, for new arrangement using Silvertown Lubricants Ltd.:

The Participation agreement between Gulf/Conoco and H.M. Government was signed on February 26, leaving the way clear to formally apply for Department of Energy approval to farm in.

The schedule includes formal Department of Energy approval, as well as Inland Revenue clearances and approvals.

By agreements dated December 29, 1976, and December 31, 1976, the interests that were the subject of the Assignment Agreement were assigned, "subject to all necessary and requisite consents and approvals," from GOGB to Silvertown Lubricants Ltd./Gulf (U.K.) Offshore Investments Ltd., which was, by then, a wholly owned U.K. subsidiary of Kupan. The

issue of whether this assignment was conditional and/or effective during the taxable year 1976 is not before this Court.

On July 1, 1982, the Commissioner timely issued a statutory notice of deficiency to petitioner, determining deficiencies in the amounts of $80,813,428 for the taxable year 1974, and $166,316,320 for the taxable year 1975. As relevant to this opinion, the Commissioner determined that the Assignment Agreement dated December 30, 1975, was a taxable event under section 367, I.R.C. 1954, as amended, resulting in ordinary income to petitioner for the taxable year 1975 in the amount of $29,652,506.

Petitioner timely filed a petition with this Court requesting a redetermination of the deficiencies as set forth in the statutory notice of deficiency, and further disputing the determination based upon claims for overpayment of tax.

## OPINION

The issues for decision are: (1) Whether the Assignment Agreement was a conditional contract; and (2) if the Assignment Agreement was a conditional contract, whether the conditions were satisfied, and the transfer, therefore, effective during the taxable year 1975. A transfer within the taxable year 1975 is a necessary prerequisite for the application of section 367, I.R.C. 1954, as amended, in this case. The existence of such a transfer depends upon the effect of the Assignment Agreement. Both petitioner and respondent offered expert testimony on the construction and application of contracts under the laws of the United Kingdom, and, to a large degree, the testimony of the expert witnesses on such law coincide.

The Commissioner's determinations in his statutory notice of deficiency are presumptively correct, and petitioner has the burden of disproving each individual adjustment. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner, therefore, bears the burden of proving that there was no transfer from petitioner to Kupan under the Assignment Agreement in the taxable year 1975.

The initial premise applicable to all contracts under U.K. law is that the court must look no further than the four corners of the document to determine its validity and construc-

tion. For purposes of the construction of the contract, therefore, we look only to the Assignment Agreement, and disregard the facts set forth above concerning the intentions or wishes of the parties.

Contracts are valid either in law or in equity. For an assignment to be effective in law, the contract must comply with section 136 of the Law of Property Act 1925,[8] which requires an absolute assignment. For an assignment to be absolute, the contract must be unconditional on its face. *Durham Bros. v. Robertson*, (1898) 1 Q.B. 765, 772. If there is a condition that must be satisfied before the contract becomes absolute, the contract is too vague, not enforceable by specific performance, and not valid by law. *Tailby v. Official Receiver*, (1888) 13 App. Cas. 523, 534, 547.

In this instance, the language of clause 1, "subject only to any requisite consents and approvals being obtained thereafter," and clause 3, "GULF and KUPAN will use their best efforts to secure the approval of the Department of Energy and any other necessary approvals and consents in connection with the assignment of GULF's interests," is clearly conditional on its face, assuming requisite consents and approvals existed at that time, and we agree with both expert witnessess that the Assignment Agreement, by its terms, is not an effective assignment in law.

A contract may be effective in equity, even though conditional on its face, upon the satisfaction of the contractual conditions. Lord Fry, in *In re Casey's Patents. Stewart v. Casey*, (1891) 1 Ch. 104, 118, explains the contrast between an unconditional and conditional assignment:

The distinction I take to be this: That an agreement which does not exhibit the intention of the parties that the property shall pass at once does not take effect as an equitable assignment at once, but only when, from the terms of the agreement, it can be gathered that the intention of the parties is that the equitable property shall pass. On the other hand, where the intention is that the property shall pass either at once or upon the satisfaction of some condition, then the equitable property does pass at once or upon satisfaction of that condition, as the case may be.

---

[8]Law of Property Act 1925, 15 Geo. 5, ch. 20, sec. 136, at 663.

We must, therefore, further examine the contract in order to determine the nature of the conditions which must be satisfied in order for the assignment to be effective.

Respondent asserts that the only "necessary" or "requisite" consents and approvals are those required to make the assignment effective. Respondent argues that Department of Energy approval, even though specifically enumerated in clause 3, was not in fact required because no such approval was required by statute to make the assignment effective. As approval or consent by the U.K. tax authorities is also not a requisite under the contract for the assignment to become effective, respondent further contends that such approval or consent is neither requisite nor necessary. Respondent argues that this position is buttressed by petitioner's inability to specify either the statutory provisions under which the Department of Energy consent is "necessary," under this interpretation of the word, or any other consent or approval "necessary" or "requisite" for the completion of the assignment under the English law of contracts. Respondent also asserts that petitioner never sought any consents or approvals from the Department of Energy or anyone else. The conclusion drawn from these arguments is that no approvals or consents were in fact requisite or necessary and that the apparent conditional language was of no effect and that the assignment was effective in the taxable year 1975.

Petitioner argues that the conditional language cannot be read in the narrow sense of only requiring those consents and approvals necessary to make the assignment effective, but that the conditions include those consents and approvals necessary to meet the commercial needs of the parties. Petitioner initially contends that the consent of the Department of Energy was necessary under section 12 of the Oil Taxation Act 1975. Petitioner also asserts, however, that the Department of Energy consent was required by the parties as a precondition to Inland Revenue approval, even if not required by statute. Petitioner further argues that the Department of Energy consent was only one of the requisite consents and approvals, and that approval by the taxing authorities was also necessary if the transaction was to have the purpose and effect intended by the parties.

We find petitioner's arguments persuasive. The pertinent language of clauses 1, 2, and 3 is:

Clause 1: "* * * subject only to any requisite consents and approvals being obtained thereafter."

Clause 2(b): "* * * pending coming into force of this agreement."

Clause 3: "GULF and KUPAN will use their best efforts to secure the approval of the Department of Energy and any other necessary approvals and consents in connection with the assignment of GULF's interests."

Respondent would read "requisite" in clause 1 and "necessary" in clause 3 to mean only "necessary to effectuate the assignment" without regard to the commercial context of the transaction. This argument is valid only if the words "requisite" and "necessary" are interpreted according to the most narrow dictionary meanings, and if the contract is viewed in a vacuum, separated from the reality that tax and regulatory consequences are always important in any major commercial transaction. Lord Wilberforce, in the often-cited case *Prenn v. Simmonds*, (1971) 1 W.L.R. 1381, 1383–1384, stated that, in order to understand an agreement:

it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. * * * We must * * * inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. * * *

     *     *     *     *     *     *     *

Surrounding circumstances may, * * * "stamp upon a contract a popular or looser meaning" than the strict legal meaning, certainly when to follow the latter would make the transaction futile. "It is easier to give a new shade of meaning to a word than to give no meaning to the whole transaction." [Quoting Justice Cardozo in *Utica City National Bank v. Gunn*, 118 N.E. 607 (1918).]

The stipulated exhibits, which were not objected to as irrelevant at the time of trial, show that both Department of Energy consent and the approval of Inland Revenue were in fact considered to be both necessary and requisite to effect the purpose of the transaction. Tax clearances and the prerequisite approval by the Department of Energy were not

merely "convenient," as asserted by respondent, but critical if the contract were not to be futile.

if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention * * * [*Prenn v. Simmonds, supra* at 1385.]

To find that the "necessary" or "requisite" consents and approvals could include consent by the Department of Energy and approval by the Inland Revenue, is to accomplish the purpose of the contract, while to find that the assignment was immediately effective would totally contradict the common intention of the parties that the assignment be conditioned upon the requisite consents and approvals.

We must, therefore, apply the contractual clauses as constructed, conditioning the assignment upon "necessary" or "requisite" consents and approvals, to determine whether any such consents and approvals existed, and if they were obtained during the taxable year 1975. The consent of the Department of Energy is specified in the contract. Petitioner's initial argument is that such approval was, in fact, required by the Oil Taxation Act 1975.

The Oil Taxation Act 1975 came into force upon receiving the Royal Assent on May 8, 1975. The act imposed a new tax, called the petroleum revenue tax, upon the profits from oil and natural gas extracted under U.K. license, and contains a complex scheme for the determination of the expenditures which may be deducted to determine profits. The act permits an "uplift" of 75 percent on the actual capital expenditures on the field, a matter of particular concern to petitioner and Kupan. Section 12 of the Oil Taxation Act 1975 defines a "licensee" for purposes of the Act as follows:

(a) the person entitled to the benefit of a licence or, where two or more persons are entitled to the benefit of a licence, each of those persons; and

(b) a person who has rights under an agreement which is approved by the Board [defined in section 21(2) as the Commissioners of Inland Revenue] and is certified by the Secretary of State to confer on that person rights which are the same as, or similar to, those conferred by a licence;

Both petitioner and Inland Revenue consistently operated on the assumption that petitioner's assignment to Kupan was the type of agreement which required prior approval under section 12 of the Oil Taxation Act of 1975. Gulf had, in fact, already been notified by Inland Revenue that it was considered to be a licensee within the terms of section 12, and that Inland Revenue, therefore, mandated the Department of Energy consent before tax clearance would be given. Furthermore, the broad oversight policy set forth in the Williams letter (*supra* pp. 449–450 of this opinion) appeared to require review and approval, even if not statutorily required, or mandated by Inland Revenue.

Respondent cites the Wilcox memorandum of October 27, 1975 (*supra* pp. 453–454 of this opinion), for the proposition that petitioner thought that no consents were necessary. He further asserts that petitioner did not seek the consent or approval of the Department of Energy or of anyone else. The Wilcox memorandum is merely one document of many, and is from one of petitioner's non-tax attorneys to an attorney in the tax department. Its context makes clear that the notifications referred to were primarily of a purely contractual nature, and not related to tax clearances, consents, and approvals. The second assertion is contradicted by the record showing countless meetings with Inland Revenue and numerous contacts with the Department of Energy with respect to the preliminary participation agreements. The argument also disregards the fact that Department of Energy and Inland Revenue approval were both sought and obtained for the transfer from GOPCO to Gulf.

Respondent places some reliance on the fact the Petroleum and Submarine Pipelines Act 1975, although placing a new consent requirement upon such contracts, did not apply retroactively to this type of agreement, if executed before January 1, 1976. Petitioner does not disagree, and sought consent from the Department of Energy under that statute only when it appeared that the new agreement would be included within the ambit of the Petroleum and Submarine Pipelines Act 1975, as well as the Oil Taxation Act 1975. It is apparent, however, that the consent of the Department of Energy was mandatory under section 12 of the Oil Taxation Act 1975, as discussed above; that it was advisable under-

standing Government policy as reflected by the Williams letter (*supra* pp. 449–450 of this opinion); and that it was also required by the Inland Revenue before it would give tax approval.

Further, approval of the agreement by the Department of Energy was not the only "requisite" consent or approval that had to be obtained before the assignment would be effective. Inland Revenue was consulted regularly by both petitioner's employees and petitioner's representatives at Price Waterhouse about the numerous tax matters to be resolved. Respondent contends that Kupan would have had no interest in the tax consequences to petitioner, and that Kupan would interpret the language of clauses 1 and 3 to mean only those conditions that would effectuate the assignment. This contention disregards the "matrix of facts" set forth by Lord Wilberforce in *Prenn v. Simmonds, supra*, including the inception of the arrangement, and the very purpose and aim of the transaction. It also disregards the fact that at least some of the potential adverse tax consequences would have fallen upon Kupan.

A final argument by respondent is that petitioner itself treated the assignment as effective until it became apparent that the assignment as originally structured would have adverse tax consequences. The record is ·clear that the potential difficulties with Inland Revenue were known before the execution of the Assignment Agreement, and that the assignment was treated as ineffective pending resolution of the controversy. The language in D.H. North's notes of the meeting on February 6, 1976 (*supra* p. 457 of this opinion), that "it was thought that the best way of tackling the problem was to treat the * * * agreement as being a conditional one," is more indicative of a characterization of the reason why the assignment was ineffective than an attempt to avoid a completed assignment. The parties to the agreement did treat the agreement to assign as effective throughout, but also consistently treated the assignment itself as conditional.

The major items for consent and approval which were conditions precedent to an effective assignment, and which petitioner continued to attempt to resolve after the end of the taxable year 1975, were:

(1) When and if the participation agreements between the oil companies with interests in the North Sea oil fields and the U.K. Government would be resolved;

(2) Whether the Department of Energy would provide approval under its general oversight policy, and certification under the Oil Taxation Act 1975;

(3) Whether capital gains tax would be imposed by the Inland Revenue under section 38(5) of the Finance Act 1973;

(4) Whether Kupan and Gulf would be able to obtain tax relief for the capital expenditures incurred under the Oil Taxation Act 1975;

(5) Whether Inland Revenue might not approve of the transaction for non-tax reasons, i.e., its concerns about fragmentation or the commercial basis for the transaction; and

(6) Whether the necessary consents to the proposed assignment could be obtained under the contractual agreements governing various operations of the North Sea oil field.

It is not necessary for us to resolve when, if ever, all of the necessary consents and approvals were obtained for the assignment, as restructured in the taxable year 1976. We hold merely that the assignment under the Assignment Agreement was subject to numerous conditions, and that the conditions were not satisfied during the taxable year 1975. The Assignment Agreement did not, therefore, effect a transfer of any interests from Gulf to Kupan in the taxable year 1975.

We again note that this opinion resolves this one issue only, and that all other issues in this docket are still before the Court.

We decide this issue for petitioner.