GULF OIL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22499–82.    Filed January 30, 1986.

*J. Waddy Bullion, Emily A. Parker, Sean T. Crimmins, Buford P. Berry, J. Y. Robb III*, and *Margaret S. Alford*, for the petitioner.

*Raymond L. Collins* and *William B. Lowrance*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable year 1974 in the amount of $80,813,428 and for the taxable year 1975 in the amount of $166,316,320. Petitioner and respondent, by motion granted on November 10, 1983, agreed that

certain issues would be severed and tried at a special trial session which was held at Dallas, Texas.

One of the issues tried was designated by the parties as the "Iranian Foreign Tax Credit" issue. This requires the resolution of two issues relating to petitioner's business operations in Iran during the taxable years 1974 and 1975: (1) Whether petitioner held an economic interest in Iranian oil and gas after execution of the 1973 agreement which will determine (a) whether income taxes paid by petitioner's wholly owned subsidiary to Iran during the taxable year 1975 are creditable under section 901(f),[1] and (b) whether petitioner's wholly owned subsidiary was entitled to claim percentage depletion on proceeds from sales of oil in Iran during the taxable year 1974; and (2) whether the 1973 agreement was a nationalization of depreciable assets and, if so, whether gain or loss should be recognized in the taxable year 1975.[2] Issues relating to the proper interpretation and application of section 907 to the amount of petitioner's creditable foreign taxes were not severed or set for trial.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated by this reference.

Gulf Oil Corp. (hereinafter referred to as petitioner or Gulf) is a corporation organized under the laws of the Commonwealth of Pennsylvania which has its principal office in Pittsburgh, Pennsylvania. During the taxable years at issue, Gulf and certain of its subsidiary corporations constituted an "affiliated group" as that term is defined in section 1504. Petitioner, directly and through its foreign subsidiaries and affiliates, is engaged in world-wide exploration, development, production, purchase, and transportation

---

[1] All section references are to the Internal Revenue Code of 1954, and attendant regulations as amended and in effect for the relevant years, and all Rule references are to this Court's Rules of Practice and Procedure.

[2] Two additional issues will be affected by, but not totally resolved, as a result of our findings herein: (1) Whether the income taxes paid to Iran during the taxable year 1975 are subject to adjustment under sec. 901(e), and (2) whether petitioner's consolidated carryover of Iranian income tax credits from the taxable years 1970 through 1974 must be reduced. These issues were not severed or set for trial.

of crude oil and natural gas and in the manufacture, transportation, and marketing of petroleum products.

Petitioner maintained its books of account for the taxable years in issue on the accrual method of accounting using the calendar year as its taxable year. Gulf, as the common parent of an affiliated group of corporations, timely filed consolidated Federal income tax returns for its taxable years 1974 and 1975 on behalf of itself, and certain of its subsidiary corporations, with the Office of the Internal Revenue Service in Pittsburgh, Pennsylvania. On its return for the taxable year 1974, petitioner claimed a deduction for depletion of hydrocarbons in Iran in the amount of $121,641,999. On its return for the taxable year 1975, petitioner claimed a credit for income taxes paid to Iran in the amount of $320,691,083.

The Iranian oil industry was nationalized in 1951. Thereafter, Iran was the sole owner of the minerals and refineries within its borders. As a result of the nationalization, the National Iranian Oil Co. (NIOC) was organized to operate the oil fields and refineries previously operated by Anglo-Iranian Oil Co., Ltd. (now the British Petroleum Co., Ltd.). All of the shares of NIOC were held by the Government of Iran. After the nationalization, negotiations between the Iranian Government and representatives of certain oil companies were carried on for the purpose of formulating a basis upon which operation of the Abadan Refinery and the operation and development of the south Iranian oil fields could be resumed. During these negotiations, the Iranian Government indicated that petroleum products produced in, or exported from, Iran pursuant to the proposed agreement should be purchased from NIOC at the wellhead and then resold to affiliated and third-party customers.

On October 29, 1954, Gulf Oil Corp. and certain other oil companies (Gulf and such companies, their successors, and assignees being collectively referred to as the consortium) and the Government of Iran and NIOC entered into an agreement (hereinafter referred to as the 1954 agreement). The stated purpose of the 1954 agreement was to provide for effective marketing of Iranian crude oil, natural gas, and refined petroleum products by use of the consortium's capital, and management and technical skills. The term of

the 1954 agreement was 25 years, with a right by the consortium to renew the agreement for three additional 5-year periods. Part I of the 1954 agreement set forth the arrangements between the consortium, NIOC, and Iran relating to the exploration, production, purchase and sale of Iranian crude oil, natural gas, and refined petroleum products. Part II of the 1954 agreement set forth a final settlement between Iran and Anglo-Iranian Oil Co., Ltd., pursuant to which outstanding claims relating to the 1951 nationalization of the Iranian oil industry were settled between those two parties.

In connection with the 1954 agreement the consortium formed two Dutch companies, Iraanse Aardolie Exploratie en Productie Maatschappij (hereinafter referred to as the Oil Exploration & Producing Co.), and Iraanse Aardolie Raffinage Maatschappij (hereinafter referred to as the Oil Refining Co.), referred to jointly as the operating companies. The Oil Exploration & Producing Co. had the right to explore for and produce crude oil, natural gas, and petroleum products from a defined area of southern Iran known as the agreement area. The Oil Refining Co. had the right to refine such crude oil, natural gas, and petroleum products. Iran and NIOC retained rights (a) to have the accounts of the operating companies audited; (b) to receive upon request technical data and other information relating to operations under the agreements; and (c) to inspect the technical activities of the operating companies. The crude oil, natural gas, and refined petroleum products were produced by the operating companies for Iran, which had been vested with legal title to the minerals in place since the 1951 nationalization.

Pursuant to article 18 of the 1954 agreement, each member of the consortium was entitled to nominate one of its subsidiaries as a trading company registered in Iran. The trading companies purchased Iranian oil from NIOC for resale by the trading companies. Petitioner's trading company was Gulf International Co. (hereinafter referred to as Gulf International), a wholly owned domestic subsidiary of petitioner, which produced and sold crude oil, natural gas, and refined petroleum products in Iran. Gulf Iran Co., also a wholly owned domestic subsidiary of petitioner, purchased

substantially all of the production of Gulf International at posted prices[3] and resold the crude oil and petroleum products to affiliated and third party customers. The pertinent articles of the 1954 agreement respecting the purchase of crude oil by the trading companies, including Gulf International, provided:

### ARTICLE 18A

The Consortium members shall purchase crude oil and may purchase natural gas from NIOC and shall resell in Iran for export from Iran

(1) the crude oil and natural gas so purchased, except so much thereof as is delivered to refinery hereunder, and

(2) the petroleum products derived in Iran from the crude oil so delivered.

Any such purchase or resale shall be made upon the terms and subject to the conditions set forth in this Agreement.

\*  \*  \*  \*  \*  \*  \*

### ARTICLE 18D

Trading companies \* \* \* shall purchase from NIOC all crude oil produced by the Exploration and Producing Company other than crude oil used or consumed in the latter Company's operations and crude oil required to meet NIOC's requirements for petroleum products for internal consumption in Iran under Article 14 of this Agreement.

Under article 18D(3) of the 1954 agreement, title to the crude oil and natural gas purchased by the trading companies from NIOC passed from Iran to the trading companies at the wellhead. Pursuant to article 22 of the 1954 agreement, the crude oil was purchased from NIOC by the trading companies for a stated payment equal to 12½ percent of the posted price of such crude oil. In lieu of all or part of the 12½ percent stated payment for crude oil, NIOC was entitled under article 23 of the 1954 agreement to elect delivery of crude oil in kind valued at the applicable posted

---

[3]The posted price for Iranian crude oil, under the 1954 agreement, was defined as:

(1) in the case of crude oil loaded on board tankship for export from Iran the price f.o.b. tankship at seaboard terminal, being the price at which crude oil of equivalent quality and gravity is offered for sale by a Trading Company or its affiliated company to buyers generally for delivery under similar conditions and at the same seaboard terminal, and

(2) in the case of crude oil delivered to refinery the price of crude oil of equivalent quality and gravity offered for sale as above f.o.b. tankship at refinery port less such an amount (not exceeding 8d. per cubic meter) as may fairly and reasonably be attributed to the loading charge of crude oil at such refinery port.

price. The purchase price that each trading company was required to pay to NIOC for natural gas under the 1954 agreement was a stated payment for each 1,000 cubic meters of such gas equal to 5 percent of that trading company's posted price.[4] In addition to the stated payments for which the trading companies purchased Iranian crude oil and gas, NIOC was entitled under articles 14, 15, and 19 of the 1954 agreement to receive an amount of crude oil and gas produced by the operating companies sufficient to meet the requirements for internal consumption in Iran. Iranian income tax was imposed upon the profits made by the trading companies upon resale of the oil, natural gas, and refined petroleum products in Iran, with certain deductions allowed for operating costs, a discount, and the stated payment to NIOC.

The amount of crude oil and natural gas to be produced, after allowance for operational losses, was the quantity required to meet NIOC's requirements for internal consumption in Iran, the quantity (if any) required to provide NIOC with crude oil in kind under article 23, and the quantity required by the trading companies as determined by them. Under article 25 of the 1954 agreement, each trading company was required to sell crude oil exported from Iran at such prices so that its total gross receipts in each year from such sales were not less than a sum equal to the value at the applicable posted price of all crude oil exported from Iran in that year by the trading company and its customers, plus the value at the applicable posted price of crude oil delivered to the refineries in Iran for that trading company's account, plus as an aggregate of other specified charges.

Article 13D of the 1954 agreement required the trading companies to provide all funds required by the two operating companies for working capital and for the financing of assets and facilities to be used for operations under the 1954 agreement. The trading companies also were obligated to reimburse each operating company for its operating costs including expenditures for exploration and development.

---

[4]The posted price was, under the 1954 agreement, based upon the fair market value of 1 cubic meter of 37 degree to 37.9 degree API of Agha Jari quality f.o.b. Bandar Mashur as of the date of delivery of such gas.

The operating companies were paid fees for their services by the trading companies at the rate of one shilling per cubic meter of crude oil delivered by the Oil Exploration and Producing Co. and 1 shilling per cubic meter of crude oil refined by the Oil Refining Co. NIOC was obligated under article 14E to pay that portion of the operating companies' fees and operating costs attributable to the crude oil, natural gas, and refined petroleum products produced for internal consumption in Iran.

Under the 1954 agreement, the operating companies had the right to use all fixed assets and facilities that were within the agreement area although Iran, acting through NIOC, retained ownership of such assets. The operating companies were entitled to include a fixed assets charge in their operating costs for the first 10 years of the agreement in recognition of their obligation to replace these assets, at their expense, as needed over the term of the agreement. The operating companies were also entitled to include an additional charge in their operating costs for the book value or cost of any new or additional assets or facilities purchased or built by the operating companies for NIOC's benefit, with the repayment of expenditures to be made ratably over a 10-year period. The initial cost of these assets was to be financed through funds provided to the operating companies by the trading companies.

The consortium later formed a holding company, Iranian Oil Participants, Ltd. (IOP), and a service company, Iranian Oil Services, Ltd. The shares of the two operating companies and IOP were owned by the members of the consortium in proportion to the interests set forth below:[5]

Anglo-Iranian Oil Co., Ltd. .......................... 40 percent
(now British Petroleum Co., Ltd.)
N.V. de Bataafshe Petroleum Maatschappij ........... 14 percent
(now Shell Petroleum N.V.)
Gulf Oil Corp. ........................................ 7 percent
Socony-Vacuum Oil Co., Inc........................... 7 percent
(now Mobile Oil Corp.)
Standard Oil Co. of California ....................... 7 percent
Standard Oil Co. (New Jersey) ....................... 7 percent

[5]The Iricon group of companies joined the consortium on Apr. 29, 1955. Prior to that time, the percentage interests of certain of the companies listed above were 1-percent greater than the figures set forth above.

The Texas Co. (now Texaco Inc.)..................... 7 percent
Compagnie Francaise des Petroles ................... 6 percent

Gulf International, petitioner's trading company, paid taxes to Iran with respect to its income from the purchase and sale of crude oil and natural gas and from the refining and sale of petroleum products under the 1954 agreement. A ruling was sought from the Internal Revenue Service as to the question of whether the rights of the trading companies to the oil produced constituted economic interests. Petitioner received a ruling from the Internal Revenue Service dated September 17, 1954 (the 1954 ruling). The Commissioner ruled that the arrangement had "all the essential characteristics of a lease," thus creating an economic interest for which percentage depletion was allowable. The stated payments made to NIOC were treated as the equivalent of a one-eighth reserved royalty. The Commissioner also ruled that the taxes paid were creditable foreign income taxes for Federal income tax purposes. A letter ruling dated April 27, 1955, extended the rights under the 1954 ruling to the Iricon group.

The parties to the 1954 agreement, the consortium members, NIOC, and Iran, amended the agreement on four occasions before 1973. The first amendment to the 1954 agreement was made by the supplemental agreement of January 11, 1965, which made changes of a technical nature to the pricing and other provisions of the 1954 agreement and which also reflected certain changes in the composition of the consortium. A letter agreement dated December 11, 1966, set forth Iranian requirements for specified amounts of crude oil to be delivered by Iran to certain other countries in exchange for goods. The letter agreement specified that the crude oil to be taken in kind for this purpose would be deemed a part of the stated payment to which NIOC was entitled under articles 22 and 23 of the 1954 agreement. An aide memoire dated December 23, 1966, set forth certain agreements concerning the accounting and taxation of sales by the trading companies of natural gas liquid products pursuant to the 1954 agreement.

The final amendments to the 1954 agreement were made by the Tehran agreement executed on February 14, 1971,

between and among six countries in the Arabian Gulf: Abu Dhabi, Iran, Iraq, Kuwait, Qatar, and Saudi Arabia, and certain oil companies (including petitioner), which amended the 1954 agreement between petitioner and Iran as well as the existing participation agreements between the oil companies and other signatory countries. With regard to oil lifted during the period from February 15, 1971, through December 31, 1975, the Tehran agreement provided that each oil company (including petitioner) would increase the posted prices at which it resold crude oil for export from the producing countries. The Tehran agreement further provided that tax rates in all of the six signatory countries would be stabilized at not less than 55 percent and that, during the term of agreement, none of these countries would seek to increase the governmental share of the proceeds or impose other financial obligations over those specified in the agreement. Although the original terms of the 1954 agreement were amended in some respects, the consortium of which petitioner was a member continued to operate using this same basic structure until 1973.

Although the 1954 agreement had not yet expired, the consortium members entered into a sale and purchase agreement (the 1973 agreement) with Iran and NIOC on July 19, 1973.[6] The term of the 1973 agreement was 20 years from its effective date of March 21, 1973. After the effective date, petitioner obtained oil in Iran for export pursuant to the provisions of the 1973 agreement. Selected paragraphs of the preamble to the 1973 agreement provided that:

WHEREAS the Government of Iran and the National Iranian Oil Company desire to develop and exploit the hydrocarbon resources of the country to the optimum extent and thereby to maximise the benefits to and prosperity of the Iranian Nation resulting therefrom; and

WHEREAS in fulfilment of the above objective Iran is determined that the right of full and complete ownership, operation and control in respect to all hydrocarbon reserves, assets and administration of the petroleum industry shall be exercised by NIOC; and

\*      \*      \*      \*      \*      \*      \*

[6]Two separate annexes were attached to the 1973 agreement. Annex 1 contained schedules relating to the area covered, membership of the consortium, determination of the balancing margin and interest, profit on sales of products, and programming procedures for NIOC export crude. Annex II contained related memoranda concerning certain matters set forth in the agreement.

WHEREAS Iran and NIOC are desirous that consumers throughout the world should continue to have access to supplies of Iranian crude oil and products, and are able to make such crude oil and products available to such consumers to an increasing extent; and

$$*\quad *\quad *\quad *\quad *\quad *\quad *$$

WHEREAS with a view to the full realization of the objectives set out above, the Parties hereto agree that the general relationship of Iran-/NIOC and the above mentioned oil companies shall be revised and adjusted as set forth in this Agreement; * * *

The 1973 agreement continued the use of the trading company concept as set forth in the 1954 agreement. Article 2E of the 1973 agreement provided that the rights and obligations of consortium members relating to the purchase and resale of crude oil thereunder could be exercised and performed by affiliated trading companies. Gulf International continued to be the trading company through which petitioner engaged in the marketing of Iranian crude oil and natural gas and was the entity which performed petitioner's obligations under the 1973 agreement.

Under the terms of the 1973 agreement, exploration, production, and refining activities were no longer to be conducted by the operating companies as under the 1954 agreement. Instead, pursuant to article 17 of the 1973 agreement, a joint stock company formed by the consortium members, but funded by NIOC, was to perform the exploration, drilling, and producing operations assigned to it by NIOC in accordance with a 5-year renewable service contract. The rights and activities of the two operating companies formed in conjunction with the 1954 agreement were terminated as of July 19, 1973.

Article 11A of the 1973 agreement provided that NIOC would provide all capital and other funds required for the purpose of all operations under the 1973 agreement. Article 11, however, also required that the trading companies advance to NIOC, as a prepayment for crude oil to be purchased by them, 40 percent of NIOC's annual budgeted capital expenditures for operations under the 1973 agreement. These annual advances were to be amortized over a 10-year period and then set off against payments due to NIOC for the crude oil. Gulf International made regular advances to NIOC for capital and operating funds pursuant to article 11 of the 1973 agreement until the Iranian

revolution at the end of 1978. Gulf International began the recoupment of the advances made to NIOC pursuant to article 11 through the sale of production from the Iranian consortium areas until the situation disintegrated in 1978.

Article 24 of the 1973 agreement provided that the assets and facilities used in operations under the 1973 agreement, as well as the hydrocarbon reserves themselves, continued to be owned exclusively by NIOC and that the terms of the agreement should not be construed as granting in any manner to the consortium members or their trading companies any right inconsistent with NIOC's exclusive ownership of such assets, facilities, and reserves. Article 10 of the 1973 agreement, however, permitted the trading companies to set off against payments due NIOC for the crude oil and processing an amount with respect to the portion of the net book value or cost of all assets employed or under construction by the operating companies as of March 20, 1973, which had not yet been paid for by previous operating cost adjustments.

Article 2C of the 1973 agreement provided that NIOC would produce and sell to the consortium members (or their trading companies) for export in each year such quantities of crude oil and other petroleum products as the consortium members nominated as their requirements in accordance with article 3. Article 2D required the consortium members to resell such crude oil in Iran. As under the 1954 agreement, title to the crude oil and other petroleum products purchased from NIOC passed to each trading company at the wellhead. Under article 2 of the 1973 agreement, NIOC was entitled to an amount of crude oil sufficient to satisfy the internal requirements of Iran and a separate stated quantity for its own export in that year. The stated quantity for NIOC's export was to be phased in over a 9-year period and thereafter was subject to a ceiling, measured by that proportion of the total quantity of crude oil available for export in any year which 1.5 million barrels per day bears to the total quantity of crude oil available for export in 1981. After allowing for the internal requirements of Iran and the stated quantity for its own export under the 1973 agreement, NIOC was to notify the trading companies, pursuant to article 3, by September 1 of each year as to the

quantity of crude oil available for sale to them in the following year. The trading companies were then to make annual nominations by October 1 of their requirements for specified quantities of crude oil to be exported as crude oil as well as their requirements for crude oil to be refined at Abadan Refinery during the following year. Any excess crude oil remaining after the trading companies had received the amount of production requested was available for export by NIOC. Conversely, if the excess crude oil beyond that originally required by the trading companies were not required by NIOC, the trading companies could purchase the excess quantity.

In the event that NIOC made an inaccurate and low estimate of the total quantity of crude oil available, the trading companies were entitled to increase their nominations up to the amount of the excess production. If the estimate of production were too high compared to actual production, the quantities available to NIOC and the trading companies were to be reduced ratably unless the reduction was insufficient in which case the trading companies' share alone was to be reduced. A similar ratable reduction for both NIOC and the trading companies was to be applied if NIOC were unable by reason of force majeure to make the required amount available to export.

The purchase price that each trading company was required to pay to NIOC for crude oil sold and delivered to it either on board ship or at Abadan Refinery, as set forth in article 6A and 8A(1) of the 1973 agreement, consisted of four parts: (1) Operating costs attributable to the crude oil, such as depreciation and amortization charges and the costs of transporting to the point of delivery, but limited to costs incurred by NIOC that were attributable to the extraction of crude oil; (2) a stated payment, equal to 12½ percent of the applicable posted price of the crude oil; (3) a balancing margin; and (4) interest.

Article 6A(3) of the 1973 agreement provided that the level of the balancing margin component of the purchase price for crude oil would:

when taken together with all other financial and fiscal benefits accruing to Iran and NIOC * * * be such as to assure Iran that the total financial benefits and advantages to Iran and NIOC under this Agreement shall be

no less favourable than those applicable (at present or in the future) to other countries in the Persian Gulf under the General Agreement and related arrangements;

Article 6B(1) further provided that for the period March 21, 1973, through December 31, 1973, and for the years 1974 and 1975, the balancing margin was estimated at 6.5 U.S. cents per barrel.

Under Article 5 of the 1973 agreement, as under the 1954 agreement, each trading company was required to publish posted prices for each quality and gravity of crude oil, and to sell the crude oil exported from Iran at such prices that its total gross receipts in each year from such sales were not less than a sum equal to the value at the applicable posted price of all crude oil exported from Iran in that year by the trading company and its customers, plus an aggregate of other specified charges. In accordance with this requirement, Gulf International purchased crude oil from NIOC at the wellhead and sold substantially all of such oil to Gulf Iran. Gulf Iran in turn resold the crude oil to affiliated and third-party customers.

The purchase of natural gas under the 1973 agreement was handled in a different fashion. The trading companies were obligated to purchase all of the natural gas not required by NIOC for internal consumption in Iran. The price paid was calculated according to a modified version of the provisions of articles 6A and 8. No portion of the payments made by the trading companies computed with reference to 40 percent of the annual capital investment anticipated by NIOC was allocated to a prepayment for natural gas.

Article 19A of the 1973 agreement provided that each trading company pay Iranian income tax on its total net income in accordance with articles 134 and 173 of the Direct Taxation Act of March 19, 1967, as the act was in force on January 1, 1973. The stated payments and other payments made to the Iranian Government were not directly set off against the taxes due under either the 1954 agreement or the 1973 agreement. Under both agreements, however, the stated payments and other payments to NIOC or Iran generally were deductible in computing the net profits of each trading company for Iranian tax purposes. For the

taxable year 1975, petitioner paid Iranian income taxes in the amount of $243,795,264.

Petitioner did not request a ruling from the Internal Revenue Service as to whether it held an economic interest in Iranian hydrocarbons after the execution of the 1973 agreement for purposes either of the foreign tax credit under section 901(f) or the percentage depletion deduction under sections 611 and 614. Prior to 1975, the Internal Revenue Service had not disallowed the foreign tax credits claimed by Gulf International for Iranian income taxes paid. Another consortium member requested a ruling based upon the terms of the 1973 agreement and was informed by the Commissioner in Technical Advice Memorandum LTR 8034021 dated May 15, 1980, that the 1973 agreement provided no more than an economic advantage to the oil companies rather than the economic interest necessary for allowance of the foreign tax credit under section 901. The purported lack of an economic interest also resulted in the disallowance of a deduction for percentage depletion.

The Commissioner, in the statutory notice of deficiency, disallowed petitioner's deduction of $121,641,999 for depletion of Iranian hydrocarbons in 1974.

The Commissioner allowed a deduction, rather than a credit, for a portion of the amounts that petitioner paid to Iran during the taxable year 1975. The amounts allowed as deductions consisted of income taxes in the amount of $243,795,264, found to be substantiated but not creditable, and an extra payment that was not an income tax, in the amount of $45,965,654 that was determined to be noncreditable extra payments. The difference between the amount claimed as a credit under section 901 on petitioner's return in the amount of $320,691,083, and the amount allowed as a deduction by the Commissioner, in the amount of $289,760,918, or $30,930,165, was disallowed both as a deduction and a credit. In the alternative, the Commissioner determined that petitioner failed to substantiate the amount of foreign tax creditable under section 901, an issue which has been partially settled by the parties' stipulation that Gulf paid income taxes to Iran in the amount of $243,795,264 during the taxable year 1975.

The final adjustment made by the Commissioner that is relevant to the issues to be decided by this opinion was an

adjustment in the amount of $2,801,811 of section 1231 gain which the Commissioner determined was realized and reportable, pursuant to sections 451 and 1231, in the taxable year 1975 as a result of credits given by Iran to the consortium members for fixed assets under article 10 of the 1973 agreement.

## OPINION

The determinations of the Commissioner in his statutory notice of deficiency are presumptively correct, and petitioner has the burden of disproving each individual adjustment. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). The issues for decision are: (1) Whether petitioner held an economic interest in Iranian oil and gas after execution of the 1973 agreement which will determine (a) whether income taxes paid by petitioner's wholly owned subsidiary to Iran during the taxable year 1975 are creditable under section 901(b), and (b) whether petitioner's wholly owned subsidiary is entitled to percentage depletion with respect to its gross income from sales of oil in Iran during the taxable year 1974; and (2) whether the 1973 agreement was a nationalization of depreciable assets and, if so, whether gain or loss should be recognized in the taxable year 1975.

Section 901(a) allows, subject to certain limitations,[7] a credit against income tax for amounts described in section 901(b) which provides:

---

[7]Sec. 901(e) reduces the amount of allowable credit under certain circumstances:

SEC. 901(e). FOREIGN TAXES ON MINERAL INCOME.—

(1) REDUCTION IN AMOUNT ALLOWED.—Notwithstanding subsection (b), the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or possession of the United States with respect to foreign mineral income from sources within such country or possession which would (but for this paragraph) be allowed under such subsection shall be reduced by the amount (if any) by which—

(A) the amount of such taxes (or, if smaller, the amount of the tax which would be computed under this chapter with respect to such income determined without the deduction allowed under section 613), exceeds

(B) the amount of the tax computed under this chapter with respect to such income.

(2) FOREIGN MINERAL INCOME DEFINED.—For purposes of paragraph (1), the term "foreign mineral income" means income derived from the extraction of minerals from mines, wells, or other natural deposits, the processing of such minerals into their primary products, and the transportation, distribution, or sale of such minerals or primary products. Such term includes, but is not limited to—

(A) dividends received from a foreign corporation in respect of which taxes are deemed paid by the taxpayer under section 902, to the extent such dividends are attributable to foreign mineral income, and

(B) that portion of the taxpayer's distributive share of the income of partnerships attributable to foreign mineral income.

SEC. 901(b). AMOUNT ALLOWED.—Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States;* * *

Section 901(f), which generally disallows the tax credit for income taxes paid or accrued to a foreign country in connection with the purchase and sale of oil or gas extracted in that foreign country, provides:

SEC. 901(f). CERTAIN PAYMENTS FOR OIL OR GAS NOT CONSIDERED AS TAXES.—Notwithstanding subsection (b) and sections 902 and 960, the amount of any income, or profits, and excess profits taxes paid or accrued during the taxable year to any foreign country in connection with the purchase and sale of oil or gas extracted in such country is not to be considered as tax for purposes of section 275(a) and this section if—

(1) the taxpayer has no economic interest in the oil or gas to which section 611(a) applies, and

(2) either such purchase or sale is at a price which differs from the fair market value for such oil or gas at the time of such purchase or sale.

The income taxes stipulated to have been paid by petitioner to Iran during the taxable year 1975 will, therefore, be a credit under section 901(b) against income tax, unless the credit is not allowable by virtue of section 901(f). Petitioner must, therefore, prove either that the purchases of crude oil and refined products during the taxable year 1975 were at a price equivalent to fair market value or that the interest held by petitioner in Iranian oil and gas continued to be an economic interest under section 901(f)(2) after the execution of the 1973 agreement. The interest of petitioner in Iranian oil and gas was an economic interest before that time, as confirmed by the Commissioner's 1954 ruling.

The price paid to NIOC for crude oil and refined petroleum products under the terms of the 1973 agreement was based, in part, upon the posted price, which was the closest parallel to fair market value within the constraints of the developing oil crisis situation. Only a percentage of the

posted price, however, was included in the computation of the price to be paid to Iran and NIOC. That price also included adjustments related to operating costs, a balancing margin, and interest, as well as the setoffs for the assets and facilities built before 1973 and for the capital budget payments made by the consortium members. None of these latter components relate to the fair market value of the oil or gas. Petitioner has the burden of proving that the price paid for the crude oil under the agreement was, nevertheless, equal to fair market value and has not done so. Rule 142(a). Petitioner, therefore, cannot avoid disallowance of the foreign tax credit by virtue of section 901(f)(2). To prevail, petitioner must have an economic interest in the Iranian minerals in place under section 901(f)(1) in order for the income taxes paid to Iran during the taxable year 1975 to be treated as a credit against U.S. income tax.

Petitioner's claim to a deduction for depletion in the taxable year 1974 also requires a determination of whether petitioner continued to hold an economic interest after execution of 1973 agreement. Section 611(a) provides that "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion." This deduction "is permitted in recognition of the fact that * * * mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production." *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 366 (1938). The deduction for percentage depletion is allowed as long as the minerals are being extracted and sold regardless of cost incurred by the taxpayer. Sec. 613; *Burton-Sutton Oil Co. v. Commissioner*, 328 U.S. 25, 34 (1946). The deduction is not dependent upon the particular legal form of the taxpayer's interest in the property. *Anderson v. Helvering*, 310 U.S. 404 (1940). However, only individuals owning an economic interest in a depletable resource are entitled to the deduction for depletion. *Palmer v. Bender*, 287 U.S. 551, 557 (1933).

The determination of whether or not petitioner held the economic interest required for the depletion deduction and the foreign tax credit during the taxable years at issue necessarily depends on the definition of an economic inter-

est found in section 1.611–1(b)(1), Income Tax Regs.:

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. For an exception in the case of certain mineral production payments, see section 636 and the regulations thereunder. A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic ineterest.* * *

Petitioner contends that it retained an economic interest after execution of the 1973 agreement on the basis of two alternative arguments. It argues first that the 1973 agreement was no more than a modification and continuation of the 1954 agreement under which it held an economic interest. As discussed in the 1954 ruling, petitioner, as a consortium member, participated in the exploration for and production of oil and gas through the operating companies, was entitled to dispose of a portion of the production, and was to look to such production for a return on its investment. Paragraph 6 of the preamble to the 1973 agreement is specifically cited for the proposition that the general relationship of Iran and NIOC and the consortium members was only "revised and adjusted." Alternatively, petitioner argues that Gulf retained an economic interest by virtue of: (1) Its prior investments in exploration, drilling, and producing activities under the 1954 agreement; (2) its investments in assets and facilities already existing or under construction by the consortium at the time of execution of the 1973 agreement, as expressly recognized under article 10 of the 1973 agreement; (3) its investments through the advance payments that it was required to make to NIOC pursuant to article 11 of the 1973 agreement; (4) the fact that it continued to pay all of the costs of operation and production because these costs were a direct factor in the determination of the purchase price of the minerals; and (5) the fact that petitioner could look only to

the extraction and sale of oil in Iran for a return of its investments in Iranian hydrocarbons.

Respondent argues that the 1973 agreement totally changed the relationship between Iran and NIOC and the consortium members. Respondent claims that the "investments" listed by petitioner are no more than prepayments or items recoupable through setoffs or recoverable through depreciation. He argues that neither the items recognized as setoffs against the purchase price nor the prepayments are the equivalent of a capital investment in the minerals in place.

Although section 1.611-1(b), Income Tax Regs., set forth above, purports to adequately define the term "economic interest," a long line of cases has expanded upon the vague meaning of the term. Even the courts, however, have found it difficult to single out one recurring factor that clearly indicates ownership of an economic interest in the minerals in place. *Tidewater Oil Co. v. United States*, 168 Ct. Cl. 457, 339 F.2d 633 (1964).

The purchaser need not have legal title to the property to have an economic interest;

It is enough, if by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so he has an economic interest in the oil, in place, which is depleted by production. * * * [*Palmer v. Bender*, 287 U.S. 551, 557 (1933).]

A taxpayer has an "economic interest" in minerals regardless of the legal form of the interest if he has acquired the interest by investment in the minerals in place, and looks to the extraction of the minerals for the return of his investment. *Thomas v. Perkins*, 301 U.S. 655, 661 (1937). See also *Weaver v. Commissioner*, 72 T.C. 594 (1979).

The test under section 1.611-1(b)(1), Income Tax Regs., requires first that there be an "investment," which requires that the payments must be in exchange for the receipt of minerals and that there must also be an investment in the production. *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981); *Weaver v. Commissioner*, 72 T.C. 594 (1979). Thus, where the taxpayer is merely a processor of oil and not engaged in production, the taxpayer has no interest in the minerals in place. The fact that the taxpayer obtains

an economic advantage from the production of the mineral is not adequate to create an economic interest. *Helvering v. Bankline Oil Co., supra* at 367–369. "The test * * *is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted." *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603 (1946). "Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil." *Kirby Petroleum Co. v. Commissioner, supra* at 604.

The fact that Iran held legal title to both the minerals in place and all assets and facilities necessary for the production of those minerals is not determinative of whether petitioner held an economic interest during the taxable years at issue. *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308 (1956). The tax law deals in economic realities, not legal abstractions, and we must view the entire transaction to determine its ultimate impact. *Commissioner v. Southwest Exploration Co., supra* at 315.

The "investment" test requires only an economic commitment to look to production of the mineral for income. *Commissioner v. Southwest Exploration Co., supra.* There must be a clear capital interest in the mineral which diminishes as the mineral is extracted, and the taxpayer must share directly in the economic productivity of the minerals and the market risk upon sale of the minerals. *Weaver v. Commissioner, supra.*

A comparison of the 1954 and 1973 agreements clearly demonstrates that the latter agreement merely revised and adjusted the earlier agreement according to the intentions of the parties as set forth in the preamble to the 1973 agreement. Under the 1954 agreement, the consortium members, through the operating companies, had direct control of exploration, drilling, and production. Under the 1973 agreement, NIOC directed, through a service agreement with the joint stock company, the exploration, drilling, and the amount of production. The joint stock company was, however, formed by the consortium members under the terms of the contract in a similar fashion to the original operating company structure. Further, the operating expenses of the joint stock company continued to be paid by

the consortium as a portion of the purchase price paid for the crude oil. Under the 1973 agreement, the only portion of the operating expenses of the joint stock company paid by NIOC was with respect to the oil taken in kind by NIOC as part of its stated payment or for the internal needs of Iran. These arrangements are remarkably similar to the payment of expenses under the 1954 agreement. The consortium members, through the joint stock company, continued to participate in the operations of the oil field and continued to finance a major portion of its operation.

Under the 1954 agreement, the operating companies had sole discretion to determine the amount of production so long as the amount produced was in excess of the requirements of Iran and NIOC. Under the 1973 agreement, the consortium members were instead required to make annual nominations for their requirements. NIOC was, however, required by the terms of the 1973 agreement to provide the consortium with its requirements unless the initial estimate was high (in which case the share of NIOC would also be reduced) or an act of God prevented full production. The consortium members, including petitioner's trading company, still retained a substantial amount of control over the amount of the production.

This ability to determine the amount of production was vital to the consortium as the 1973 agreement placed a number of financial obligations upon it that could be repaid only through the production of minerals. The amounts invested by the consortium in assets and facilities before 1973 were to be repaid solely by means of setoffs against the payments to be made to NIOC for the crude oil delivered to its members.[8] Further, the consortium was required to make an annual investment in the assets and facilities and

---

[8]The reference within art. 10 of the 1973 agreement to the undepreciated and unamortized portion of the net book value of certain assets does not, as respondent infers, indicate that petitioner was entitled to or did recover its investment in these assets and facilities through deductions for depreciation. Before 1973, the operating companies recovered the cost of assets and facilities ratably over a 10-year period as a part of their operating costs or fixed assets charges. The amount of setoff each year would necessarily vary according to the costs incurred, but was in no fashion computed with reference to normal depreciation deductions. The 1973 agreement fixed the amount of costs that had not yet been repaid as part of the operating costs or fixed assets charge, and provided for continuation of the recovery process by prorated setoffs over the next 10 years. Under both agreements, the consortium members, through the operating companies or through the capital budget payments, paid for the assets and facilities, with repayment of the investment through setoff. There is no indication that petitioner was able to depreciate this investment before or after 1973.

other items included in the capital budget, all of which items were necessary to the production of the minerals. The only means by which the consortium members could be repaid for their investments was by the production of the minerals. No other method was established by the 1973 agreement by which these amounts could be recovered.

We find that petitioner has established that it had made and was continuing to make investments in the production of the minerals, which investments could be recovered solely by means of production of those minerals. Petitioner, therefore, held an economic interest, and not merely an economic advantage, in the Iranian minerals in place after execution of the 1973 agreement.

Once petitioner's interest has been defined as an economic interest under section 611, petitioner is then entitled to a foreign tax credit under section 901 in the amount of $243,795,264 for the taxable year 1975 (subject to adjustment under section 907), and to a deduction for depletion under section 611 in the amount of $121,641,999 for the taxable year 1974.

The second issue for decision is whether the 1973 agreement was a nationalization of depreciable assets and a taxable event from which gain should be recognized during the taxable year 1975. Respondent argues that article 10 of the 1973 agreement expressly provides for setoffs to be made by the operating companies against payments due to NIOC for depreciable assets and facilities employed or under construction by the operating companies under the 1954 agreement. Respondent contends that the amounts to be paid under article 10 represent a payment for sale of these assets. Under respondent's theory, postponement of recognition of any gain realized from the taxable year in which the 1973 agreement was executed to the taxable year 1975 is justified by reliance upon an apparent change in petitioner's internal accounting that did not occur until the taxable year 1975. No evidence was presented at trial or by stipulation as to the characterization of these items upon petitioner's books or as to when any changes in characterization might have occurred. Respondent argues, in essence, that petitioner referred to these items as capital assets before 1975 but referred to them as accounts receivable thereafter, thus

justifiying recognition in 1975 of any gain realized.

Petitioner argues that the setoffs under article 10 were a mere continuation of the arrangement under the 1954 agreement by which Iran and NIOC would repay the consortium members for their investments in assets and facilities. Petitioner further submits that, if execution of the 1973 agreement were a sale or exchange of these assets, any gain realized should have been recognized as income in the taxable year 1973, not the taxable year 1975, regardless of any apparent delay in relabeling of these items on the internal books of the corporation.

This Court has no jurisdiction to determine a tax liability with respect to a taxable year for which no deficiency has been determined unless resolution of the issue is necessary for the proper determination of tax liability for taxable years before the Court. Sec. 6214(b). Petitioner, as an accrual basis taxpayer, must report income in the taxable year in which all the events have occured which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Sec. 1.446–1(c)(1)(ii), Income Tax Regs. All events with respect to the alleged sale or exchange occurred in the taxable year 1973, a taxable year that is not before us. As neither party has suggested that the resolution of this issue will affect the tax liability for either of the taxable years at issue, we are without jurisdiction to consider this matter. Sec. 6214(b).

We again point out that this opinion resolves certain severed issues only, and that all other issues not previously decided in this case[9] are still before the Court.

---

[9]The issue designated by the parties as the "North Sea Farmout" issue was decided by this Court in, *Gulf Oil Corp. v. Commissioner*, 84 T.C. 447 (1985).